**In re Vytautas VEBELIUNAS, Debtor.**

**Bankruptcy No. 98 B 45466 TLB.**

United States Bankruptcy Court,
S.D. New York.

March 10, 1999.

Warshaw Burstein Cohen, Schlesinger & Kuh, L.L.P., New York City, by Edgar H. Booth, Donald L. Kuba, Warren R. Graham, for Chapter 7 Trustee.

Roy Babitt, New York City, Chapter 7 Trustee.

Vytautas Vebeliunas, Richmond Hill, New York, pro se.

Moses & Singer, L.L.P., New York City, by Alan E. Gamza, for Citibank, N.A.

Tracy Hope Davis, New York City, for Office of the United States Trustee.

## OPINION DISQUALIFYING COUNSEL TO CHAPTER 7 TRUSTEE

TINA L. BROZMAN, Chief Judge.

Concerns and fears of partisan bias in the House of Representatives and in the voting by Senators rocked the impeachment process of President William Jefferson Clinton. As it turned out, once the Senators viewed the evidence and gave it the weight they deemed appropriate, they did not vote along unified party lines but acquitted the President. I mention this only to illustrate what a destructive force bias can be if it is allowed to go unchecked and how important in the judicial and quasi-judicial arenas it is first to amass reliable evidence and only then to formulate an opinion.[1] In fact, the point in time when an opinion is formed is essential to the distinction between bias on the one hand and reasoned judgment on the other. Today, I address that very issue as it relates to the disinterestedness of counsel to the chapter 7 trustee on account of his clear expression of prejudice against the debtor before any § 341 or other examination of him by the trustee.

## I.

### A. Procedural History

Vytautas Vebeliunas, the debtor *pro se* in this converted chapter 7 case, moved to disqualify Roy Babitt, the chapter 7 trustee assigned to his case, by reason of an alleged conflict of interest arising out of a prior representation of the debtor's affiliate by the firm where Mr. Babitt is of counsel but which does not represent him in this matter. In a decision issued from the bench, I held that there was absolutely no basis in law or fact

warranting the trustee's disqualification for a conflict of interest or for any other reason, however, I instructed the trustee to engage substitute counsel because it had become apparent from the pleadings that his counsel, specifically Warren Graham of Warshaw Burstein Schlesinger & Kuh ("Warshaw Burstein"), was not disinterested as required by § 327(a) of title 11 of the United States Code (the "Bankruptcy Code"). Warshaw Burstein expressed shock at my ruling, not only because the firm clearly did not appreciate it,[2] but because it claims it was not put on notice that I was going to raise and address what was in the papers but what the debtor did not address during his oral argument. Being a firm believer in due process and not wishing to deprive anyone of his or her right to be heard, I allowed Warshaw Burstein to respond in writing and then orally at a subsequent hearing.[3] I did this despite the fact that I regarded the issue of counsel's disinterestedness to be sufficiently glaring from the papers submitted that adequate and sufficient notice of its existence was provided. However, that is only my opinion and reasonable minds do differ.

### B. Background

#### 1. The Lattingtown Question

Vebeliunas may or may not own a piece of property located in Lattingtown, New York, which was last valued at $4.5 million. When he filed his chapter 11 petition, Vebeliunas did not schedule the property, taking the position instead that it is owned by a trust in which he has a 20% interest. Several banks with liens against the property totaling less than $2 million moved to dismiss the chapter 11 case, asserting that Vebeliunas did indeed own the property but that they could pursue foreclosure in state court. Instead, because Vebeliunas may have significant unsecured

---

1. I wish only to use this event in history to describe the potential evils of bias. I express no position whatsoever on the impeachment of President Clinton.

2. After the hearing, I received a scathing letter from Edgar Booth of Warshaw Burstein, asserting that my ruling had impugned the integrity of not only Graham, but himself and, ultimately, the whole firm. That leap of logic, or illogic, contin-

ues to mystify me. Moreover, I am not impugning Graham's integrity as an attorney appearing in this court. What I am saying is that he has exhibited in this case an unfortunate bias which demands his removal.

3. I have treated this matter *de novo*, rather than as a motion for reconsideration, inasmuch as Warshaw Burstein questioned whether it received due process the first time round.

debt which, if the Lattingtown property is his, possibly could be satisfied in whole by his equity in that property, I converted the case to a chapter 7 liquidation, noting that the trustee was to examine into the ownership question. Roy Babitt was appointed chapter 7 trustee, with Warshaw Burstein being retained as his counsel.

### 2. The Telephone Call With Monica Setikas

Prior to the debtor's scheduled § 341 examination,[4] Vebeliunas' assistant, Ms. Monica Setikas, telephoned Graham requesting information about the upcoming meeting. Her reason for calling, she claimed, was that Vebeliunas had not received timely notice of it and that the notice he finally did receive contained inaccurate information. In response to her request, Graham allegedly told Ms. Setikas that he did not believe "anything the debtor said in this case," that he was getting a court reporter and that Vebeliunas had better be at the meeting. This conversation was first brought to the court's attention in Vebeliunas' papers moving for the trustee's disqualification. *See* Vebeliunas Moving Affidavit, ¶ 15. In his papers opposing the debtor's motion, Graham recounts the same exchange as follows:

> The Debtor's suggestion in paragraph 15 of the Vebeliunas Affidavit that "Mr. Babitt, without ever speaking to [him], has instructed his attorneys not to believe [him]," is also without any factual basis. The Debtor's motion papers then go on to detail a conversation between Monica Setikas, an associate of the Debtor, and Warren R. Graham, a member of the Warshaw Burstein firm, and the author of these papers, quoting Mr. Graham as stating that he "did not believe anything Mr. Vebeliunas said in this case." While that quote is *substantially accurate*, the skepti-

cism contained therein is entirely predicated on the record and the gross inconsistency of the Debtor's position concerning ownership of the property, with among other things, his previous sworn statements. [5]

*See* Trustee's Opposition, ¶ 19 (emphasis added). However, at the hearing, Graham testified that he did not remember the conversation with any specificity; with respect to his comment expressing his disbelief of Vebeliunas, Graham said he thought that he made that remark in connection with Vebeliunas' claims of deficient notice. In their papers moving for reconsideration, neither the firm nor Graham makes any statement reflecting this position. In fact and significantly, the firm's and Graham's affidavits in opposition to disqualification continue to recount Graham's remark to Monica Setikas as one expressing disbelief of anything the debtor had to say in the case generally. *See* Warshaw Burstein Affidavit in Opposition to Disqualification, ¶ 12; Graham Affidavit Annexed to Warshaw Burstein Affidavit in Opposition to Disqualification, ¶ 7. In paragraph 7 of Graham's affidavit, he goes through a detailed list of reasons, only one of which was the repeated claim of deficient notice, why "in frustration and exasperation, [he] spontaneously remarked that [Graham] did not believe anything [Vebeliunas] said." Graham Affidavit Annexed to Warshaw Burstein Affidavit in Opposition to Disqualification, ¶ 7. If Graham had wished to clarify the context in which he remarked on the debtor's credibility, he had several opportunities to do so before the *de novo* hearing. But he did not. Had Graham not changed his story when he testified, it would have been unnecessary to make a credibility determination. But I believe I have no choice now other than to render such a determination. I find Gra-

---

**4.** To date, no § 341 examination has taken place.

**5.** The banks seeking dismissal of the case had asked, when the case was retained, that the state court receiver for the property also be retained. They ultimately withdrew that request in favor of having the trustee administer the property, which, by the way, is income producing. Vebeliunas countered with an assertion that the trustee could not administer the property because it did not belong to the debtor's estate. Graham prob-

ably extrapolated from Vebeliunas' petition and his opposition to the request for the trustee to administer the property as well as from documents which the banks showed Graham from the time when their mortgages were granted that Vebeliunas was not credible, despite the fact that Graham had not yet asked Vebeliunas if there was any explanation for what Graham saw as inconsistencies.

ham's testimony at the hearing to have been evasive and not credible.

In the most recent brief submitted by Warshaw Burstein in opposition to its disqualification, Warshaw Burstein attempts to justify Graham's conclusions about the debtor by stating:

> it is respectfully urged upon this court that when a debtor swears to directly contrary facts on numerous occasions and transfers the same piece of property numerous times outside the chain of title, it is not essential for the Trustee, or his counsel, to "get his side of the story" prior to concluding that he has no credibility.

*See* Warshaw Burstein Affidavit in Opposition to Disqualification, ¶ 27. Graham also suggested that his frustration and exasperation with the debtor [6] "together with the Debtor's status as a convicted felon gave [Graham] ample justification to doubt [Vebeliunas'] credibility, and did not impose upon [Graham] an additional duty 'to get his side of the story.' " *See* Graham Affidavit annexed to Warshaw Burstein Affidavit in Opposition to Disqualification, ¶ 8. Notwithstanding Graham's statements, Vebeliunas has contended in court papers that the other parties in interest misapprehend the facts relating to the chain of title of the property and Vebeliunas further says that he has an explanation to support his own view of the documents to which Graham has referred.

## II.

■■■ Counsel's compliance with the disinterestedness requirement under § 327(a) not only applies at the time of retention but also throughout the case, *see In re Granite Partners, L.P.,* 219 B.R. 22, 32 (Bankr. S.D.N.Y.1998); *Rome v. Braunstein,* 19 F.3d 54, 62 (1st Cir.1994), and is so crucial to the proper functioning of the bankruptcy system that a court may raise it and dispose of it whenever its sanctity is questioned. *See In re Martin,* 817 F.2d 175, 180 (1st Cir.1987) (discussing the bankruptcy court's fundamental responsibility, to monitor the integrity of the proceedings before it); *In re Plaza Hotel*

*Corporation,* 111 B.R. 882, 891 (Bankr. E.D.Cal.1990) (the court has a continuing supervisory role during the case which includes the ability to revisit issues such as disinterestedness whenever appropriate); *Booth v. Continental Insurance Company,* 167 Misc.2d 429, 634 N.Y.S.2d 650, 653–654 (Sup.Ct.West.Co.1995) (*citing Wagenheim v. Pomerantz,* N.Y.L.J. 7/7/70, p. 13, col. 7 at p. 14, col. 1 (Sup.Ct.West.Co.)) (citing cases) ("the judiciary will not close its eyes when the suggestion of impropriety appears on the record and the issue may be raised *sua sponte* "); *In re Kelton Motors, Inc.,* 109 B.R. 641, 650 (Bankr.D.Vt.1989); *see generally Flushing Savings Bank v. FSB Properties, Inc.,* 105 A.D.2d 829, 482 N.Y.S.2d 29, 31 (App.Div.1984). If there was any infirmity in my issuing my prior ruling without advising the firm that I was considering its removal, that infirmity has been cured by the leave I subsequently granted Warshaw Burstein to appear and be heard on this issue. *See Kelton Motors,* 109 B.R. at 650.

The crux of Warshaw Burstein's argument is that neither the trustee nor trustee's counsel need be disinterested vis-à-vis the debtor and that counsel had no duty to question the debtor before concluding that he is completely untrustworthy. Further, Warshaw Burstein argues, Graham was entitled to disbelieve the debtor pre-examination without compromising counsel's disinterestedness should I find that that standard applies to the firm.

## III.

■■ I feel compelled to first put to bed any doubt as to Graham's bias and how I reached the conclusion that he possessed one. The pertinent facts are simple. Prior to any examination of the debtor by the trustee or his counsel in connection with the chapter 7 case, Graham made an unequivocal statement to the effect that he believed Vebeliunas to be a liar. In his affidavits, Graham manifested a further belief that the debtor did not deserve the opportunity to explain himself because he is a convicted felon. *See* Graham

---

**6.** I do not mean to suggest that the debtor is the cooperative, easy-going sort. Graham's frustration and exasperation may be quite legitimate.

The issue, however, is not whether Graham has good reason for disliking Vebeliunas.

Affidavit annexed to Warshaw Burstein Affidavit in Opposition to Disqualification, ¶ 8. WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY defines prejudice as "a preconceived judgment or opinion" and "an opinion or leaning adverse to anything without just grounds or before sufficient knowledge." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (Merriam–Webster, Springfield Mass.1981). The same source defines bias as "such prepossession with some object or point of view that the mind does not respond impartially to anything related to this object or point of view."[7] *Id.* While Vebeliunas may turn out to be guilty, as alleged, of supplying misinformation to the parties in interest, absent a bias or prejudice, Graham simply cannot have concluded that Vebeliunas is lying on Graham's part because there has not been an examination of Vebeliunas, and, therefore, the totality of evidence needed for Graham to have formed a reasoned judgment is not yet available. Quite obviously Graham is biased against the debtor, for when Ms. Setikas merely requested information for Vebeliunas, Graham responded by attacking the debtor's credibility, thereby demonstrating a complete lack of impartiality with respect to anything having to do with him.

Warshaw Burstein and Graham contend that the comments to Ms. Setikas about the debtor were perhaps "impolitic" but not serious enough to raise a question as to counsel's disinterestedness. An impolitic remark is an unwise remark. *See id.* During his conversation with Ms. Setikas, had Graham quipped "Vebeliunas probably threw out the notice I sent him," that would have been an unwise and inappropriate remark, but not one indicating bias or prejudice. However, telling a debtor's representative that you don't believe a word the debtor says *before you have spoken with the debtor* is significantly more troubling. It indicates a predisposition not to trust, listen to, believe in or have confidence in that person.

I recognize that, factually at least, this case is unique, unlike any other reported decision. Whereas most of the decisions regarding the propriety of the retention of counsel involve a conflict of interest, this case admittedly does not address an actual, potential or apparent conflict; the debate that surrounds disqualifying conflicts of interest is not implicated here. Jurisprudential precedent on this topic therefore may only serve to guide me as I make inroads into what amounts to be pristine territory. *See Board of Education of the City of New York v. Nyquist,* 590 F.2d 1241, 1246 (2d Cir.1979) (*quoting Fund of Funds, Ltd. v. Arthur Andersen & Co.,* 567 F.2d 225, 227 (2d Cir. 1977)).

## IV.

The Bankruptcy Code sets forth a two-pronged test for the retention of estate professionals. *See* 11 U.S.C. § 327(a); 11 U.S.C. § 101(14). In order for the trustee to retain professionals to represent or assist him or her in carrying out the duties spelled out under § 704 of the Bankruptcy Code, those professionals must meet both requirements. *See Martin,* 817 F.2d at 180; *Granite,* 219 B.R. at 32; *In re Envirodyne Industries, Inc.,* 150 B.R. 1008, 1016 (Bankr. N.D.Ill.1993). First, § 327(a) authorizes the trustee, with the court's approval, to employ "one or more attorneys ... that do not hold or represent an interest adverse to the estate;" and second, "that are disinterested persons." 11 U.S.C. § 327(a). The "adverse interest" element in § 327(a) is undefined by the Bankruptcy Code but has been judicially fashioned to mean either (1) the possession or assertion of any economic interest that would tend to lessen the value of the bankruptcy estate or create an actual or potential dispute with the estate as a rival claimant, or (2) a predisposition of bias against the estate. *Kravit, Gass & Weber, S.C. v. Michel (In re Crivello),* 134 F.3d 831, 835–36 (7th Cir.1998); *Smith v. Marshall (In re Hot Tin Roof),* 205 B.R. 1000, 1003 (1st Cir. BAP 1997); *Granite,* 219 B.R. at 33; *Envirodyne,* 150 B.R. at 1016–17; *In re Roberts,* 46 B.R. 815, 827 (Bankr.D.Utah 1985) *aff'd in part, modified in part and rev'd in irrelevant part,* 75 B.R. 402 (D.Utah 1987). We are unconcerned

---

7. Quoting Walter Moberly, the dictionary gives a particularly apt illustration of the word's meaning: "The most pernicious kind of bias consists in falsely supposing yourself to have none."

here with § 327(a)'s first prong, no adverse interest, but are more concerned with disinterestedness, the second prong, because the bias exhibited is against the debtor, rather than the estate.

■ Unlike the "adverse interest" prong of the test, disinterestedness is delineated in the Bankruptcy Code. So far as relevant here, § 101(14)(E) of the Bankruptcy Code, more commonly known as the catch-all clause, see *Granite,* 219 B.R. at 32; 3 L. King, COLLIER ON BANKRUPTCY, ¶ 327.04[4][e] at 327–43 (15th ed. rev.1996), defines a disinterested person as one that "does not have an *interest materially adverse* to the *interest of the estate* or of any class of creditors or *equity security holders,* by reason of any direct or indirect relationship to, connection with, or interest in, the debtor or an investment banker specified in subparagraph (B) or (C) of this paragraph, *or for any other reason.*" 11 U.S.C. § 101(14)(E) (emphasis added); *see In re Marvel Entertainment Group, Inc.,* 140 F.3d 463, 476 (3d Cir.1998) ("One is 'disinterested person' only if he [or she] has no interest that is materially adverse to a party in interest in the bankruptcy."). It is well-recognized that the meaning of the phrase "interest materially adverse" in the definition of a disinterested person overlaps with that of "interest adverse" in the first prong of § 327(a) and, together, they form one hallmark with which to evaluate whether professionals seeking court-approved retention (or to remain retained by the estate) meet the absence of adversity requirements embodied in the Bankruptcy Code. *See Martin,* 817 F.2d at 180; *Hot Tin Roof,* 205 B.R. at 1003; *Granite,* 219 B.R. at 33; *In re Leslie Fay Cos.,* 175 B.R. 525, 532 (Bankr.S.D.N.Y.1994); *Envirodyne,* 150 B.R. at 1017.

Warshaw Burstein does not deny that it must be disinterested but takes issue with whether it must be so vis–a–vis the debtor, since the latter is not named in the statute. *See* 11 U.S.C. § 101(14)(E). Only if I determine that the debtor is owed such a duty need I address the second question, which is whether Graham's bias constitutes a lack of disinterestedness under the second prong of § 327(a).

## A. Must Warshaw Burstein Be Disinterested As To The Debtor?

### 1. The Debtor As A Potential Equity Security Holder

■ Counsel's obligation to be disinterested runs to the parties in interest. *See Marvel,* 140 F.3d at 476. In the typical case, the debtor has no standing to be heard on many matters not involving the discharge of debt because the outcome is irrelevant to the debtor when the estate will not generate a surplus. However, cases discussing a chapter 7 debtor's right to be heard when he or she retains an equity interest in the estate hold that the debtor has standing to lodge an objection to a claim against the estate or to participate in litigation surrounding the asset that stands to produce the surplus. *See* 4 L. King, COLLIER ON BANKRUPTCY, ¶ 502.02[2][c] at 502–14 (15th ed. rev.1996) (debtor is a party in interest and has standing to object to a claim where there could be a surplus after all claims are paid); *In re Manshul Construction Corp.,* 223 B.R. 428, 430 (Bankr.S.D.N.Y.1998); *In re McCorhill Publishing, Inc.,* 89 B.R. 393, 396 (Bankr. S.D.N.Y.1988) (in a liquidation under chapter 7, a debtor has standing to object to claims where disallowance of the claims would produce a surplus); *In re Sobiech,* 125 B.R. 110, 113 (Bankr.S.D.N.Y.1991); *In re Silverman,* 10 B.R. 734, 735 (Bankr.S.D.N.Y.1981), *aff'd* 37 B.R. 200 (S.D.N.Y.1982). In *In re Gulph Woods Corporation,* 116 B.R. 423 (Bankr. E.D.Pa.1990), the receiver for the plaintiff in an adversary proceeding commenced against the debtor sought to prevent the debtor from participating in litigation regarding the sale of property of the estate. The receiver argued that the only interest the debtor could have would be a residuary one under § 726(a)(6), which is not an independent interest and therefore unable to confer standing on the debtor to assert a claim against the receiver. The court held that standing in bankruptcy cases is unlike standing in other cases and that "a debtor may participate in litigation if that litigation will generate or protect a surplus in the estate." *Id.* at 428. In interpreting *Silverman,* a case from this district which ultimately denied the debtor's

request for standing to object to a claim against the estate because the court determined that no surplus would be generated from the claim's disallowance, the *Gulph Woods* court explained that "the [*Silverman*] court's language clearly implied that, if the *debtor could have shown that there may have been surplus* for his estate, he would have had standing, independent of trustee [sic], to object to the claim in question." *Id.* at 428–29 (emphasis added).

■ Pursuant to § 726(a)(6), if all of Vebeliunas' obligations are satisfied, he will be entitled to any surplus proceeds generated by the liquidation of the Lattingtown property.[8] Thus, this debtor should be considered a party in interest, *see* COLLIER, ¶ 502.02[2][c] at 502–14; *McCorhill,* 89 B.R. at 395 (debtor is a party in interest where he or she will retain a pecuniary interest in the equity of the estate if all the creditors can be paid in full); *In re Hutchinson,* 5 F.3d 750, 756 (4th Cir.1993) (party in interest is generally understood to include all persons whose pecuniary interests are affected by the bankruptcy proceedings); *In re James Wilson Assoc.,* 965 F.2d 160, 169 (7th Cir.1992) (everyone with a claim to the res has a right to be heard before the *res* is disposed of since that disposition will extinguish all such claims), the legal consequence of which is that Graham ought be disinterested relative to Vebeliunas because he is, for all intents and purposes, the potential class of equity security, holders under 11 U.S.C. § 101(14)(E). There is no method of protecting Vebeliunas later while a non-disinterested professional is presently in charge of the investigation, should Vebeliunas prove to be the class of equity holders. The only protection can be given now. But the broader point, despite the statute's reference to equity security holders rather than debtors,[9] is that the trustee's professionals cannot be allowed under any circumstances to lack disinterestedness through bias against a debtor given the responsibilities of the trustee in regard to a natural debtor, specifically, to examine into and object to inappropriate proofs of claim (which can inure to a debtor's benefit if the claim is not dischargeable or if there may be a surplus); to investigate into the debtor's financial affairs; if advisable, to oppose the debtor's discharge; and, if there be a surplus, to deliver it to the debtor. *See* 11 U.S.C. §§ 704(4), (5) and (6) and 726(a)(6).

## 2. "Or For Any Other Reason"

■ Separate and apart from whether or not Vebeliunas can be considered tantamount to an equity security holder under § 101(14)(E), there is a strong argument to be made that the "or for any other reason" language at the end of that subsection is intended, as noted by Collier,[10] to permit

8. Since standing is limited to parties in interest, *see Licensing by Paolo, Inc. v. Sinatra (In re Gucci),* 126 F.3d 380, 388 (2d Cir.1997), if Vebeliunas has standing to object, then he should most obviously also be considered a party in interest.

9. The lack of precision in the statute may well be due to Congress' desire to have one standard of disinterestedness apply to professionals for all sorts of debtors' estates be they corporate, partnership or natural persons.

10. In its discussion of the term disinterested person as defined in § 101(13)—now renumbered § 101(14)—of the Bankruptcy Reform Act of 1978, Collier states:

> The enunciated elements provide a minimum standard for the guidance of the court in its appointments, and insure that the persons employed shall have the essential character of independence and disinterestedness which is required. These elements do not, however, establish an exclusive standard. As was the case under pre-Code bankruptcy practice, (continued by virtue of the "catchall" provision

of clause (E)), if a court deems a particular person's associations to be prejudicial to disinterestedness, it may reject him even though those associations do not come strictly within the purview of section 101(13). Thus, the phrase "or for any other reason" permits the court to find a particular person lacking in disinterestedness for reasons other than the non-exclusive statutory guidelines.

> As noted above, clause (E) may be termed a "catch-all clause," and it seems broad enough to include anyone who in the slightest degree might have some interest or relationship that, would even faintly color the independent and impartial attitude required by the Code and Bankruptcy Rules. The reasons supporting this extensive inclusion are the same, of course, as those previously recounted. Indirect or remote, as well as direct, associations or affiliations may engender conflicting loyalties.
> ***
> It is clear, therefore, that the definition of disinterested person in paragraph (13) promotes the policy that as a general principle

"the court to find a particular person lacking in disinterestedness for reasons other than the non-exclusive statutory guidelines." *Roberts*, 46 B.R. at 828 n. 26 (*citing In re Philadelphia Athletic Club, Inc.*, 20 B.R. 328, 333 (E.D.Pa.1982) (*quoting* 1 COLLIER BANKRUPTCY MANUAL § 101.13 (1981))). The oft-quoted language [11] that "professionals engaged in the conduct of a bankruptcy case should be free of the slightest personal interest which might be reflected in their decisions concerning matters of the debtor's estate or which might impair the high degree of impartiality and detached judgment expected of them during the course of administration," [12] lifted from the COLLIER BANKRUPTCY MANUAL excerpt quoted in *Philadelphia Athletic Club* and *Roberts* is the manual's conclusion of the function and effect of the "or for any other reason" clause as it affects the meaning of disinterestedness. See COLLIER BANKRUPTCY MANUAL § 101.13. Under this view, the definition of disinterestedness pursuant to 11 U.S.C. § 101(14) is not exclusive and is an attempt, albeit not a very clear one from the drafting perspective, to allow a court to reject an attorney if it "deems a particular person's associations to be prejudicial to disinterestedness ... even though those associations do not come within the purview of section 101(13)." *Id.* Although the Second Circuit has not passed on this issue, other Circuits have implicitly endorsed this view by quoting *Roberts* (and hence the COLLIER BANKRUPTCY MANUAL) when defining disinterestedness. See *Crivello*, 134 F.3d at 835 (*citing In re BH & P, Inc.* 949 F.2d 1300, 1308 (3d Cir.1991) (*citing In re BH & P, Inc.* 119 B.R. 35, 42 (D.N.J.1990) (*citing In re Glenn Electric Sales Corp.*, 99 B.R. 596, 601 (D.N.J.1988) (*quoting Roberts*, 46 B.R. at 828 n. 26)))) (the catch-all clause is sufficiently broad to include any professional with an "interest or relationship that would even faintly color the independence and impartial attitude required by the Bankruptcy Code"); *Winship v. Cook (In re Cook)*, 223 B.R. 782, 789 (10th Cir. BAP 1998) (*quoting BH & P*, 949 F.2d at 1309 (*quoting Roberts*, 46 B.R. at 828 n. 26)) (same). Under this broad view, Graham is required to be disinterested with respect to the debtor regardless of whether or not Vebeliunas is a potential equity security holder.

## B. Standards of Disinterestedness

Courts examine the goals and purposes of the disinterestedness requirement in order to understand the full contours of that concept. To be disinterested is "to prevent even the appearance of a conflict irrespective of the integrity of the person or firm under consideration." *In re Codesco*, 18 B.R. 997, 999 (Bankr.S.D.N.Y.1982) (*quoted in Martin*, 817 F.2d at 181; *Hot Tin Roof*, 205 B.R. at 1003; *In re Kendavis Industries International, Inc.*, 91 B.R. 742, 754 (Bankr. N.D.Tex.1988)). Further, a disinterested

---

professionals engaged in the conduct of a bankruptcy case should be free of the slightest personal interest which might be reflected in their decisions concerning matters of the debtor's estate or which might impair the high degree of impartiality and detached judgment expected of them during the course of administration.

1 COLLIER BANKRUPTCY MANUAL, § 101.13 (1981).

**11.** The following cases are examples of courts using the "high degree of impartiality and detached judgment" language quoted above or its slight variation "faintly color the independent and impartial attitude required by the Code," also from the same COLLIER BANKRUPTCY MANUAL excerpt, to elucidate disinterestedness: *Crivello*, 134 F.3d at 835; *In re BH & P, Inc.* 949, F.2d 1300, 1308 (3d Cir.1991); *Martin*, 817 F.2d at 181; *Pierson & Gaylen, Ray & Terrell & Grubbs v. Creel & Atwood and Jack Bryant (In re Consolidated Bancshares, Inc.)*, 785 F.2d 1249, 1256 (5th Cir.1986); *Winship v. Cook (In re Cook)*, 223 B.R. 782, 789 (10th Cir. BAP 1998); *Hot Tin Roof*, 205 B.R. at 1003; *In re Glenn Electric Sales Corp.*, 99 B.R. 596, 601 (D.N.J.1988); *Roger J. Au & Son, Inc. v. Aetna Insurance Company (In re Roger J. Au & Son, Inc.)*, 64 B.R. 600, 604 (N.D.Oh.1986); *In re Quality Beverage & Company*, 216 B.R. 592, 595 (Bankr.S.D.Tex.1995); *Granite*, 219 B.R. at 33; *In re Prudent Holding Corp.*, 153 B.R. 629, 631 (Bankr.E.D.N.Y.1993); *Envirodyne*, 150 B.R. at 1017; *In re Ochoa*, 74 B.R. 191, 193 (Bankr.N.D.N.Y.1987); *In re Kendavis Industries International*, 91 B.R. 742, 754 (Bankr.N.D.Tex.1988); *Roberts*, 46 B.R. at 829; *Philadelphia Athletic Club*, 20 B.R. at 334 (*citing* COLLIER BANKRUPTCY MANUAL, § 101.13); *In re Codesco*, 18 B.R. 997, 999 (Bankr.S.D.N.Y.1982).

**12.** This language is only slightly modified in the current edition of COLLIER ON BANKRUPTCY. See 4 L. King, COLLIER ON BANKRUPTCY, ¶ 327.04[3][a] at 327–30 (15th ed. rev.1996).

person "should be divested of any scintilla of personal interest which might be reflected in his decision concerning estate matters." *Codesco*, 18 B.R. at 999 (*quoted in Martin*, 817 F.2d at 181; *Hot Tin Roof*, 205 B.R. at 1003; *Kendavis*, 91 B.R. at 754). The most modest interest or relationship will undo a person's disinterestedness if it "would even faintly color the independence and impartial attitude required by the Code and Bankruptcy Rules." *Roberts*, 46 B.R. at 828 n. 26 (*quoting Philadelphia Athletic Club*, 20 B.R. at 334 (*quoting* COLLIER BANKRUPTCY MANUAL, § 101.13)); *Granite*, 219 B.R. at 33; COLLIER, ¶ 327.04[3][a] at 327–30 (*citing and cited in Envirodyne*, 150 B.R. at 1017) ("Professional persons employed by the trustee should be free of any conflicting interest which might in the view of the trustee or the bankruptcy court affect the performance of their services or which might impair the high degree of impartiality and detached judgment expected of them during the administration of a case."). From this we see that what is behind prohibiting the existence of a conflict of interest or relationship is the desire to ensure the independence and impartiality of the professional to be retained.

 Any determination regarding Graham's disinterestedness would not be complete without also taking into account the fiduciary duties he has as counsel to the chapter 7 trustee. A trustee in bankruptcy, *see King v. United States*, 379 U.S. 329, 337, 85 S.Ct. 427, 13 L.Ed.2d 315 (1964); *In re Lehal Realty Associates*, 101 F.3d 272, 276 (2d Cir.1996) (a bankruptcy trustee is an officer of the court that appoints him or her); *Marvel*, 140 F.3d at 474, as well as his or her counsel, are officers of the court.[13] *See Securities and Investor Protection Corporation v. Charisma Securities Corporation*, 506 F.2d 1191, 1193–1194 (2d Cir.1974); *Grant v. George Schumann Tire and Battery Company*, 908 F.2d 874, 884 (11th Cir.1990); *Continental Illinois National Bank & Trust v.*

*Charles N. Wooten, Ltd. (In re Evangeline Refining Company)*, 890 F.2d 1312, 1323 (5th Cir.1989). "Where persons perform duties in the administration of the bankruptcy estate, they act 'as officers of the court' and not private persons." *Evangeline Refining*, 890 F.2d at 1323. "As such, trustees and attorneys for trustees are held to high fiduciary standards of conduct." *Id.; Marvel*, 140 F.3d at 474; *Philadelphia Athletic Club*, 20 B.R. at 333 ("the attorney for the trustee had to exercise the same degree of disinterestedness as the trustee himself"); *Codesco*, 18 B.R. at 999 ("trustee's selection of counsel, however, must be consistent with the high standards required of the officers of the federal courts"). These fiduciary duties are owed not only to the entire creditor body but to the debtor as well. *See Germain v. The Connecticut National Bank*, 988 F.2d 1323, 1330 n. 8 (2d Cir.1993). So the trustee's disinterested counsel must treat with the debtor in accordance with the high standards of conduct expected from fiduciaries in bankruptcy.

 Moreover, as an attorney admitted to practice in the State of New York, Graham is subject to the American Bar Association's Code of Professional Responsibility, specifically Canons 5 and 9, which require that a lawyer exercise independent judgment on behalf of his client and that "a lawyer should avoid even the appearance of impropriety." MODEL CODE OF PROFESSIONAL RESPONSIBILITY, Canons 5 and 9 (1997). Without a doubt, this case differs from the archetypical conflicts case which gives rise to consideration of the Canons. Canon 5 applies by analogy, a situation which is not so unfamiliar in the bankruptcy context because the Canons of Professional Responsibility are not an exact fit in cases involving potentially hundreds of parties and shifting alliances. *See* Gerald K. Smith, "Standards for the Employment of Professionals in Bankruptcy Cases: A Re-

---

**13.** Obviously, both chapter 7 and chapter 11 trustees are officers of the court. Many of the cases discussing the fiduciary duties of a trustee and his or her counsel are those involving chapter 11 trustees, which, independently under the Bankruptcy Code, must be disinterested. *See* § 1104(b). Although that may not be a requirement for a chapter 7 trustee ⌐lected by creditors,

it is a requirement for an interim trustee who becomes a permanent trustee under § 702(d) because interim trustees are required to be disinterested under § 701(a)(1). Such is the case here. Accordingly, those cases describing the fiduciary duties of counsel to a disinterested trustee also apply here.

sponse to Professor Zywicki's 'Case for Retaining the Disinterestedness Requirement for Debtor in Possession's Professionals,'" 18 MISS.C.L.REV. 327, 357–58 (Spring 1998). If we consider Warshaw Burstein's client to be the trustee and the estate, Canon 5 calls for the firm and, by extension, Graham to exercise independent judgment when making decisions on their behalf, a directive which sounds strikingly familiar to the goals of disinterestedness just discussed. *See Martin*, 817 F.2d at 181; *Hot Tin Roof*, 205 B.R. at 1003; *Kendavis*, 91 B.R. at 754; *Codesco*, 18 B.R. at 999 (a disinterested person must be devoid of "any scintilla of personal interest which might be reflected in his decision concerning estate matters"); COLLIER, ¶ 327.04[3][a] at 327–30.

Most courts acknowledge that to be disinterested also requires an attorney to heed the admonition contained in Canon 9. *See Martin*, 817 F.2d at 180–81 ("Section 327 is intended ... to address the appearance of impropriety as much as its substance, to remove the temptation and opportunity to do less than duty demands."); *Hot Tin Roof*, 205 B.R. at 1003; *Granite*, 219 B.R. at 34 (despite the fact that the Model Rules of Professional Conduct have dropped the appearance of impropriety standard, § 327(a) nevertheless retains it) [14]; *Glenn Electric*, 99 B.R. at 601 ("the bankruptcy rules in and of themselves incorporate considerations which are the equivalent of Canon 9's 'appearance of impropriety' standard"); *Codesco*, 18 B.R. at 999; *but see Marvel*, 140 F.3d at 477 ("We do not believe that *BH & P*'s discussion of § 101(14)(E)'s disinterested requirement, as applied to the disqualification of a trustee, mandates a conclusion that apparent conflicts alone allow a finding of disinterestedness." [15]).

## C. Counsel Is Not Disinterested

Just because there is no conflict of interest does not mean that the disinterestedness standard has not been violated and that there has not been a breach of the Canons of the Code of Professional Responsibility. Where there is a conflict, the fear is that counsel's attention and loyalty are divided by the dual representation or that counsel is swayed by an economic or personal interest so that one party is favored over another. *See generally Leslie Fay*, 175 B.R. 525 (counsel investigating financial irregularities of debtor in possession failed to disclose relationships with directors who were targets of investigation, thereby calling into question validity of investigation as a result of which counsel was sanctioned and removed from all new matters in case). The bottom line concern is that counsel's independent judgment should not be compromised in any way. If the goal is disinterestedness, whether an attorney holds a bias or instead suffers from the likelihood of tainted judgment as a result of a conflict of interest, the wrong is the same, for his or her ability to maintain independence of judgment will be negatively affected.

Another reason why this case is different from the more typical one is, for lack of a better term, the direction of the bias. While the *ratio decidendi* of most cases dealing with conflicts of interest centers on the actuality or eventuality that counsel will favor or is favoring one party over another, there is a flip side to this coin. Where one party is actively or purposely favored, another party becomes disfavored. Thus, whether counsel is disfavoring one party over another is equally significant to a court's reasoning in determining whether or not counsel is disinterested. The reason the latter construct is probably less often discussed is because the natural course of events assumes the former:

14. New York has not adopted the newer American Bar Association's Model Rules of Professional Conduct but adheres to the Model Code of Professional Responsibility.

15. Although the word "disinterestedness" is employed in this sentence, it is clear from the context that the Third Circuit intended interestedness or lack of disinterestedness. In this vein, because I find Graham has demonstrated bias, my holding that he is not disinterested on that

basis does not run afoul of the teachings of *Marvel*. The Third Circuit in *Marvel* acknowledged a *per se* rule for disqualification of counsel holding an actual conflict of interest, a rule for discretionary disqualification of counsel with a potential conflict of interest and a prohibition against disqualification of counsel based on an appearance of conflict alone. *See Marvel*, 140 F.3d at 476.

that counsel develops a bent in favor of one party which disturbs the balance of impartiality and causes another party necessarily to become slighted, albeit unintentionally. In other words, counsel may not have started off with any bias against this second party.

██ Graham's attitude is impossible to reconcile with counsel's fiduciary duties to the debtor as well as his duty to avoid even the appearance of impropriety and to exercise independent judgment. Graham is not disinterested as to Vebeliunas as Graham is required to be, either because Vebeliunas is potentially akin to the class of equity security holders under § 101(14)(E) or because Graham fails the disinterest test pursuant to a more expansive reading of that subsection's last clause. His bias impairs "the high degree of impartiality and detached judgment expected from [counsel to the trustee]" during a case. COLLIER, ¶ 327.04[3][a] at 327–30; see supra n. 11. Without a doubt Graham has leapfrogged right over the mere appearance of impropriety to land four-square on impropriety itself. This is not a situation where ethical concerns are raised by circumstantial evidence. There is direct evidence of actual bias and prejudice against the debtor. Warshaw Burstein was retained to assist the trustee in performing his duties, such as spearheading the investigation of the financial affairs of the debtor and counseling the trustee to oppose the debtor's discharge, if advisable. See 11 U.S.C. § 704. Graham has a fiduciary duty on behalf of the trustee, the estate and the debtor to carry out these tasks impartially. This is why he must be disinterested. In explaining why counsel for a chapter 11 trustee needed to be disinterested, the court in Philadelphia Athletic Club explained:

> This, of course, ... (was) quite sensible, for it would be anomalous indeed to require a trustee to be aloof from all connection with the debtor or its management, yet permit the trustee's attorney, who would necessarily be active in furthering the trustee's duties of investigation, management, prosecution, development of plans and the like, to have a close relationship with the debtor, its management or associates.

Philadelphia Athletic Club, 20 B.R. at 333 (citing 6 L. King, COLLIER ON BANKRUPTCY, ¶ 7.06 at 1203 (14th ed.1978)). Obviously, in that case, the court was concerned that the trustee's counsel's bias would cause him to favor the debtor over the rest of the creditor body. The converse concern is present in this case, but the same reasoning governs. Given Graham's prejudice, it would be naive on my part to expect Graham to be able now to conduct an impartial, untainted and independent investigation of the debtor, particularly since, in Graham's newest papers and aware of my concerns, he nevertheless asserts that he has no duty to be impartial regarding the debtor and has enough information without ever talking to the debtor to disbelieve him. See Graham Affidavit annexed to Warshaw Burstein Affidavit in Opposition to Disqualification, ¶ 8.

### D. Disinterestedness Aside, Counsel Should Be Removed

██ At least one court has found that disinterestedness need not be the exclusive test when evaluating the propriety of an attorney's retention.[16] In In re Kurtzman, 220 B.R. 538 (S.D.N.Y.1998), the district court affirmed the bankruptcy court's refusal to approve the retention of the chapter 7 trustee's chosen counsel. The bankruptcy court had denied the retention because it believed the law firm to be irresponsible with its billing practices and determined that it would not be in the best interest of the estate for the trustee to retain this particular firm. The district court affirmed, reasoning:

> Indeed, section 327(a) vests the authority for "approval" within the sound discretion of the Court. That authority would be eviscerated were the Court required to approve counsel who met the technical test for disinterest but was ill-suited for other reasons such as, for example, inexperience.

Id. at 542. Recognizing that the Third Circuit's decision in Marvel limited disqualification of an attorney on the basis of conflicts of

---

**16.** If one reads the last clause of § 101(14)(e), "or for any other reason," broadly, as I believe is its proper construction, then Kurtzman could come within the failure of disinterestedness.

interest to situations involving actual or potential conflicts, the district court remarked:

> *Marvel,* however, did not bar considerations other than conflict of interest in a court's determination of whether to appoint an attorney as trustee's counsel under § 327(a). Thus, while disinterestedness and the absence of conflicts may be central to the inquiry, they are by no means exclusive.

*Id.* Applying that rationale to this case, I believe Graham is ill-suited to serve as the trustee's counsel because of his expressed prejudice against the debtor. *Cf. Plaza Hotel,* 111 B.R. at 891–92 (where debtor's counsel exhibited clear gender bias against the chapter 11 trustee and the United States Trustee and an unwillingness to work with them for that same reason, debtor's counsel was disqualified for his unwillingness to assist the debtor in performing its duty to cooperate with them). In addition, if, indeed, the likely litigation surrounding the Lattingtown property results in a judgment that it is property of Vebeliunas' estate, then there is a possibility that Vebeliunas will receive a distribution in his case. With this in mind, Graham's bias takes on new proportions. His fiduciary obligations to Vebeliunas not only with respect to the latter's bankruptcy discharge but also with respect to his potential equity in the Lattingtown property may be compromised by Graham's partiality and impaired judgment.

### V.

 Without question, I am vested with the authority to disqualify counsel where there is evidence of lack of disinterestedness or an ethical violation justifying such a sanction. *See Cheng v. GAF Corp.,* 631 F.2d 1052, 1055 (2d Cir.1980) (disqualification is within the court's discretion); *W.T. Grant Co. v. Haines,* 531 F.2d 671, 678 (2d Cir. 1976); *Martin,* 817 F.2d at 182 ("It is for the court to decide whether the attorney's proposed interest carries with it a sufficient threat of material adversity to warrant prophylactic action (say, disqualification or disgorgement or invalidation of a lien)."); *Leslie*

*Fay,* 175 B.R. at 538 (court has wide discretion in its selection of the appropriate remedy). The Second Circuit, however, generally disfavors disqualification because it can have an immediate adverse effect on the client by separating him or her from his or her counsel of choice.[17] *See Nyquist,* 590 F.2d at 1246; *In re Wingspread Corp.,* 152 B.R. 861, 863 (Bankr.S.D.N.Y.1993). On the other hand, an exception to that general rule has been created where the attorney's conduct tends to taint the underlying trial, *see Nyquist,* 590 F.2d at 1246; *Wingspread,* 152 B.R. at 863, with any doubts to be resolved in favor of disqualification. *See Hull v. Celanese Corp.,* 513 F.2d 568, 571 (2d Cir.1975); *Wingspread,* 152 B.R. at 863.

 In this regard, "disqualification has been ordered only in essentially two kinds of cases: (1) where an attorney's conflict of interests in violation of Canons 5 and 9 of the Code of Professional Responsibility undermines the Court's confidence in the vigor of counsel's representation, or, more commonly, (2) when the attorney is at least potentially in a situation to use privileged information concerning the other side through prior representation ..." *Nyquist,* 590 F.2d at 1246 (*citing Fund of Funds,* 567 F.2d at 232–33; *Cinema 5, Ltd. v. Cinerama, Inc.,* 528 F.2d 1384 (2d Cir.1976); *Emle Industries, Inc. v. Patentex, Inc.,* 478 F.2d 562, 565 (2d Cir. 1973)). It goes without saying that the inquiry is case-specific. *See Nyquist,* 590 F.2d at 1246; *Martin,* 817 F.2d at 182 (the bankruptcy judge is on the front line and in the best position to view the situation and make the delicate judgment calls which a disqualification decision entails).

 However, while separating a client from his or her chosen counsel will undoubtedly cause disruption, "where the choice of counsel must be approved by the court as appropriate, such that the integrity of the judicial process is implicated, the cost and delay of replacing counsel with a conflict of interest may be outweighed." *Leslie Fay,* 175 B.R. at 538 (*citing Bohack Corp. v. Gulf*

---

**17.** Another reason motions for disqualification are frowned upon is that they are often interposed for tactical reasons. *See Nyquist,* 590 F.2d at 1246. However, this concern is not a factor here considering that I have raised the issue on my own motion.

*& Western Industries, Inc. (In re Bohack Corp.)*, 607 F.2d 258, 263–64 (2d Cir.1979)). This is especially true in the bankruptcy context because "the disinterestedness requirement must be strictly enforced." *Hot Tin Roof*, 205 B.R. at 1003; *Consolidated Bancshares*, 785 F.2d at 1256 n. 6 ("standards for the employment of professional persons are strict, for Congress has determined that strict standards are necessary in light of the unique nature of the bankruptcy process"); *Plaza Hotel*, 111 B.R. at 890; *Philadelphia Athletic Club*, 20 B.R. at 333 (tests of disinterestedness to be rigidly applied); *Codesco*, 18 B.R. at 1000 (*citing Woods v. City National Bank & Trust Co.*, 312 U.S. 262, 269, 61 S.Ct. 493, 85 L.Ed. 820 (1941) (*citing Meinhard v. Salmon*, 249 N.Y. 458, 464, 164 N.E. 545 (1928) (Cardozo, J.))) ("only strict adherence to these equitable principles can keep the standard of conduct for fiduciaries 'at a level higher than that trodden by the crowd' "); Michael P. Schuster, "Deciphering Conflicts of Interest in Bankruptcy Representation", 98 Com.L.J. 127, 139 (Summer 1993) (Professional ethical standards are more strictly applied in the bankruptcy context, at least insofar as the retention of professionals by the estate is concerned, in order to maintain the integrity of and respect for the bankruptcy process.).

I have found Graham to be lacking in disinterestedness. To reach this conclusion, I have considered the standards of disinterestedness, the fiduciary duty imposed on counsel as an officer of the court, and the Code of Professional Responsibility. Adopting the analogy between the estate and a client that I suggested before, Graham's prejudice clearly clouds and will continue to cloud his independent judgment when making decisions regarding estate matters in violation of Canon 5, particularly with respect to decisions involving the investigation which he is conducting, the likely Lattingtown property litigation and whether to oppose the debtor's discharge. Inasmuch as Graham is biased, he has also, by definition, committed the "lesser included offense" of not avoiding even the appearance of impropriety. The breach of Canon 9 is premised on Graham's very real manifestation of impropriety and is not based on any "horrible imaginings alone."

*Martin*, 817 F.2d at 183. Graham is therefore equally subject to disqualification on these grounds since there is a strong threat of taint which would pervade the administration of this case were Graham to remain as counsel to the trustee. *See Nyquist*, 590 F.2d at 1246. To allow a biased attorney to conduct what is supposed to be an impartial investigation of the debtor, to administer the debtor's estate when the debtor may have equity therein and to advise the trustee whether to object to the debtor's discharge will undoubtedly engender public suspicion of the integrity of the judicial process. As observed by Judge Friendly in the well-known case *In re Ira Haupt & Co.*, 361 F.2d 164, 168 (2d Cir.1966), "the conduct of bankruptcy proceedings not only should be right but must seem right." Practically speaking, to consider an economic sanction does not solve the problem because it will leave Graham's bias to reign over the administration of the case. The only way to insure that the investigation of the debtor and the administration of his case are conducted with impartiality and independent judgment is to remove and disqualify counsel from representing the trustee.

## VI.

The only remaining issue is whether the whole firm must be disqualified or whether, as the firm requests, only Graham need be removed. The general rule is that when one member of a firm is disqualified, all members of that firm must be similarly disqualified. *See United States v. Reynoso*, 6 F.Supp.2d 269, 271 (S.D.N.Y.1998); *Solow v. W.R. Grace & Company*, 83 N.Y.2d 303, 306, 610 N.Y.S.2d 128, 632 N.E.2d 437 (1994); *Philadelphia Athletic Club*, 20 B.R. at 338 n. 11. The reason for this rule is that any interest held by one attorney is imputed to the rest of the lawyers in a firm. If this were not the case, the court would be required to evaluate every other attorney in the firm in order to determine whether they were in fact affected by that interest. *See Reynoso*, 6 F.Supp.2d at 271. In correspondence to the court, Edgar Booth, a senior member of Warshaw Burstein who represented that he was speaking on behalf of the

whole firm, stated that he has adopted the position espoused by Graham, that neither the trustee nor his counsel is under any duty to give Vebeliunas an opportunity to explain his allegedly questionable behavior because of prior statements by the debtor and the fact that he is a convicted felon. As such, the rationale cited above finds a home in this case as well. If Graham's outlook is to be imputed to Warshaw Burstein, as the firm itself suggests, then the disinterestedness not only of Graham but of the whole firm is defective. The trustee may to some extent be discomfitted by having to engage new counsel. However, no § 341 examination has been conducted and the case, while not newborn, is still in its youth. Questions regarding who will administer the Lattingtown property have not even been resolved. Disqualifying counsel may be a set-back in the progress of the case, but it is an unavoidable one, in my opinion. I reiterate my instruction to the trustee to engage new counsel.

SETTLE ORDER on the debtor and the trustee consistent with this decision.